558 So.2d 1149 (1989)
Devan PARDUE
v.
Raymond W. STEPHENS, Jr.
No. CA 89 0650.
Court of Appeals of Louisiana, First Circuit.
December 22, 1989.
*1151 Hobart O. Pardue, Springfield, for plaintiff-appellee.
Gary L. Keyser, Asst. Atty. Gen., Michael W. Wascom, Baton Rouge, for defendant-appellant State of La.
Before EDWARDS, LANIER and FOIL, JJ.
LANIER, Judge.
This action is a petition for judicial review of an administrative decision by the Secretary of the Department of Natural Resources of the State of Louisiana (DNR) which denied a coastal use permit for construction work to be done at a restaurant located on the Tickfaw River in Livingston Parish. A trial de novo was held in the district court. The district court ordered the Secretary of DNR to issue the permit and pay an attorney fee of $3,500. The Secretary of DNR took this suspensive appeal.

FACTS
For many years prior to 1986, a small restaurant, bar and boat landing was operated at the intersection of Louisiana Highway 22 and the Tickfaw River in Section 42, T8S, R6E in Livingston Parish, Louisiana. The property on which this business operated was purchased by Devan Pardue, who commenced to operate the business under the name of Riverside Seafood Restaurant.
On March 10, 1986, Pardue filed an application for a permit with the Coastal Management Division of DNR to authorize dredging of two boat basins, landfilling for a parking lot, improvement of docking facilities and depositing of 426 cubic yards of excavated material in wetlands at the restaurant site. On September 17, 1986, this permit request was approved for the deposit of 635 cubic yards of fill material for the construction of a parking lot on 0.15 acres of swamp and for the removal of 165 cubic yards of fill from a 65 foot by 18 foot area of the river for a boat basin.
On November 17, 1986, DNR conducted a field investigation of the restaurant site and found a large barge with a building on it docked at the site. Pardue was advised that if the barge was to be permanently docked at the site, he would have to get a coastal use permit from DNR and a state lands permit for permanent docking in state waters.
On January 14, 1987, Pardue filed a second application for a permit with DNR seeking authority to (1) dredge a 210 by 40 foot slip for permanent docking of the barge (which would be used as a floating restaurant), (2) expand the parking area of the site with 5,710 cubic yards of fill material, and (3) install bulkheads on the north and east sides of the slip. The area affected by this proposed construction was 1.5 acres. DNR issued public notice of the filing of this application.
On January 23, 1987, the Louisiana Department of Transportation and Development (DOTD) sent DNR a letter of no objection to the project. By letter dated February 9, 1987, the Office of Preventive and Public Health Services of the Louisiana Department of Health and Human Resources (DHHR) objected to the project because the application did "not include any information on the disposal and/or treatment of sewage ..." and requested that "the subject project proposal be held in abeyance until such time as all relevant public health considerations are properly reconciled." By letter dated February 16, 1987, the Louisiana Department of Wildlife and Fisheries (DWF) advised DNR that it recommended "the denial of the proposed filling and dredging operation but do not object to a mooring system for the barge..." By letter dated February 20, 1987, the Habitat Conservation Division of the National Marine Fisheries Service of the United States Department of Commerce objected to the issuance of the permit on the following grounds:

*1152 Based on the enclosed information and our knowledge of comparable activities in similar areas, we are convinced that the proposed placement of dredged and fill material would adversely impact the resources for which we are responsible. Parking lot construction and dredging for the restaurant would destroy nearly 1.5 acres of cypress-tupelo wetlands. Although the project site normally provides estuarine fishery habitat only to species which frequent freshwater habitats (e.g., Gulf menhaden and white shrimp), it also provides valuable estuarine maintenance functions. Cypress-tupelo swamps produce plant material which is transported to estuarine areas where it contributes to the food web of many commercially and recreationally important marine species. In addition, such areas provide flood-water storage and water quality maintenance functions by trapping water-borne pollutants.
Although the project area is relatively small, permit authorization and subsequent dredging and parking lot construction would add to the cumulatively great loss and degradation of wetlands of the Lake Pontchartrain basin. Furthermore, pursuant to the 404(b)(1) guidelines of the Environmental Protection Agency, we believe that the project location is in a Special Aquatic Site, the project purpose is not water dependent, and non-wetland alternatives must be assumed to be available.
To eliminate adverse impacts to habitats supportive of living marine resources, the NMFS recommends that the project plans be revised to eliminate dredging and the placement of dredged or fill material in vegetated wetlands.
By letter dated February 25, 1987, the Fish and Wildlife Service of the United States Department of the Interior objected to the issuance of the permit on the following grounds:
The proposed project would eliminate approximately 1.4 acres of forested wetlands and 0.07 acre of shallow riverine waters, with the resultant loss of most of the affected area's fish and wildlife resource values. A commercial development such as this could increase sewage discharge into the Tickfaw River and, thereby, result in reduced water quality. In view of the anticipated fish and wildlife habitat damages associated with the proposed project and the non-water-dependent nature of the proposed restaurant and associated parking area, the FWS recommends that the requested permit be denied.
By letter dated February 27, 1987, DNR advised Pardue that it was unable to continue processing the application until the issues raised by DHHR were resolved. By letter dated March 6, 1987, DNR advised Pardue (through his agent, C.L. Jack Stelly and Associates, Inc.) as follows:
It appears that your project does not comply with the Louisiana Coastal Resources Program (LCRP) Guidelines 6.1 and 6.4. This non-compliance triggers consideration of Guideline 1.8. You may wish to provide additional information on how your project complies with Guideline 1.8. What benefits will result from the project? We are especially interested in benefits to the public in general. Will any regional, state or national interest be served by this project? A restaurant is not one of the uses identified as coastal water dependent in the LCRP; therefore use of alternative sites which do not require filling or dredging of wetlands should be feasible. If use of an alternative non-wetland site is not feasible, in your opinion, please provide information to support that opinion.
By letter dated April 27, 1987, DHHR advised Pardue that the sanitary features of the design for his restaurant on the barge were approved. By letter dated July 13, 1987, DHHR advised DNR that it was withdrawing its objection to the project.
On August 27, 1987, Mindy Lemoine, the analyst for DNR on the Pardue application, received a telephone call from Hobart O. Pardue, Jr., Devan Pardue's attorney and father, who requested a copy of the March 6, 1987 letter sent to the Pardue agent. Lemoine called Tom Plauche at the agent's office. Plauche advised Lemoine that he *1153 would send a copy of the letter to his client. By letter dated September 17, 1987, Hobart Pardue advised DNR of the following:
We have previously been represented by C.L. Jack Stelly & Associates in our application for a permit. It has come to my attention that Mr. Stelly has not been properly looking after our interests in this matter.
I had spoken to Ms. Lemoine of your office several weeks ago requesting details of any objections your office may have to the granting of our permit. I have not been furnished with this information either by your office or by Mr. Stelly.
I would appreciate your forwarding me this information so I may advise the Corps of Engineers of the status of the Coastal Use Permit from your office.
By letter dated October 1, 1987, Lemoine sent a copy of the March 6, 1987 letter to Hobart Pardue.
By letter dated October 19, 1987, Hobart Pardue responded to the letter of March 6, 1987, with the following assertions:
(1) "Regional and state interests will be served by the generation of taxes, the taking of people off unemployment rolls by providing jobs and enhancing tourism by visitors from other countries as well as other states."; (2) "A considerable investment has already been made at this site for the docking of boats and additional parking is required. We own no other land in the vicinity that will allow parking, and no alternative site is feasible." and "Adjacent to the area of fill are thousands of acres of Tupelo cypress swamp. Anyone who views the project and the area can readily see that we have no alternatives for parking. People are parking on the highway at the present time which creates a danger to human lives due to traffic. It is submitted that human safety is more important than the relatively small loss to water dependent resources."; (3) "The fact that the barge where the restaurant is located is floating definitely makes the project water dependent."; and (4) "In fact, the less-than-two-acre area of the proposed parking lot is on a well-traveled highway and waterway that also is presently adjacent to a small parking lot and a seafood restaurant on a barge which is presently moored in Tickfaw River. The human activity in this area has resulted in the movement from the area of any wildlife to the adjacent thousands of acres of wetlands. We submit there would be no impact whatsoever on wildlife by dredging the small slip and filling the approximately one and one-half acres of wetlands to expand the existing parking lot."
By letter dated November 3, 1987, Hobart Pardue wrote to the DWF and offered to restore wetlands on 15 acres of other Pardue owned property "in mitigation" for the use of the 1.5 acres of wetlands at the project site. Specifically, he advised as follows:
If we are granted a permit to dredge and fill the approximately one and one half acres adjoining our present parking lot, we agree to construct a levee along the drainage ditch and canal bank in order to re-flood the former Tupelo cypress swamp containing approximately fifteen acres and will sign a covenant that this area will remain flooded in perpetuity.
We further agree to provide at least twelve wood duck boxes. We will also stock the swamp and pond area with native fishes and crawfish.
By letter dated November 25, 1987, DWF advised DNR that "[W]e do not object to the proposed project provided the applicant implements the mitigation plan as described in his letter of November 3rd within one year of receiving the permit."
By letter dated December 9, 1987, DNR requested the following specific information from Hobart Pardue: (1) how will the project enhance tourism; (2) what public revenues will be generated by the project; (3) how many jobs will be created by the project; (4) what is the feasibility of using five suggested alternative sites described in this letter; (5) what is the feasibility of alternative parking (a) on another barge, (b) on a non-wetland parking area with shuttle service, and (c) on a nearby abandoned highway right of way; and (6) is the *1154 area in which the mitigation will take place below the five-foot contour.
By letter dated December 10, 1987, Hobart Pardue responded as follows:
In response to your letter of December 9, 1987, we propose to enhance tourism by constructing facilities to allow houseboats for rent to tourists to be docked at the site of this project. The Lieutenant Governor's office advises that there are many requests for information on the rental of houseboats in this area, and none are presently available.
At the present time, Riverside has approximately nine employees. With the increased parking and docking facilities, we anticipate the employment of approximately thirty people. The construction will also provide jobs for local people. We also anticipate an increase in volume of business of approximately 200 percent. This will increase the amount of sales taxes to the state and local governments by that percentage.
As to the feasible and practical alternative locations of the barge, you have suggested five sites:
1. The first site on the borrow canal or Pass Manchac in the vicinity of Manchac or Galva would require extensive dredging and filling of wetlands moreso than we propose at the present location. The canal bank itself belongs to the Department of Highways for right of ways.
2. The location on the Ponchatoula Creek in the vicinity of Wadesboro would require dredging and filling of wetlands since the low bridge construction and shallow water would make it impossible to move the barge to areas above the five-foot contour. The same is true as to your location 5 on the Natalbany River in the vicinity of Springfield.
3. As to your location three on the Amite River in the vicinity of Carthage Bluff Landing, Clio and Whitehall, these locations are either not for sale or have no access by highway or would require extensive dredging or filling of wetlands.
4. On Tickfaw or Blood Rivers in the vicinity of Terry Harbor, Warsaw Landing or Jack Island, no land is available for purchase for a commercial establishment that would not require extensive dredging or filling of wetlands.
In every case listed above, it would be necessary to obtain permits for filling and dredging a greater amount of wetlands than our proposed project.
As to your comments that another barge could be docked for parking, I find this suggestion absolutely absurd. It would be necessary to construct a roadway to that barge which would require the filling of a significant amount of the area we propose to fill anyway.
Your proposal for a shuttle service for parking is not feasible. I am informed by the Highway Department that the new bridge will probably be constructed on the existing right of way of the present bridge or that right of way will be used for a public boat launch; therefore, we cannot park vehicles on that right of way.
As to your comment on the previous permit (P860220), I hired consultants and asked them to obtain the permit for full development of this facility. I have since discharged them because they did not properly represent me in this matter, and I do not feel that I should be penalized for their mistakes.
I have offered mitigation in good faith and feel that you are being unreasonable in rejecting this mitigation because you state that it does not fall below the five-foot contour. If you wish to send an engineer to the area we propose to flood in mitigation, I feel you will find that it is below the five-foot contour.
On December 17, 1987, DNR received a letter from the United States Environmental Protection Agency which objected to the project with the following rationale:
The 404(b)(1) guidelines (40 CER Part 230) require that no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences. Furthermore, according to the *1155 404(b)(1) guidelines, where the activity proposed does not require access or proximity to or siting within the special aquatic site (wetland) in question to fulfill its basic purpose, i.e., is not water dependent, practicable alternatives that do not involve special aquatic sites are presumed to be available unless clearly demonstrated otherwise. From the information available in this notice, it appears that portions of the work proposed are not water dependent.
The proposed project would result in the filling of approximately 1.5 acres of freshwater swamp. We are concerned about the loss of valuable wetland resources where practicable alternatives are presumed to be available. We therefore recommend the Corps of Engineers deny this permit application as currently proposed.
By letter dated December 28, 1987, DNR reviewed the December 10, 1987 Pardue letter and requested the following information: (1) since houseboat rentals are an expansion of the original application, discuss and provide plans for parking and docking facilities for that activity; (2) give specific details about how the project will increase employment and tax revenues; (3) provide additional information to show that alternative sites are not available; and (4) provide a map of the property to be used for mitigation showing surveyed elevations and give more details about how mitigation will be accomplished.
By letter dated January 12, 1988, Hobart Pardue responded to the December 28, 1987 DNR letter as follows:
In response to your letter of December 28, 1987, if we are allowed the permit to expand our parking facilities and dredge a slip to move the barge-restaurant, our existing docks may be used to dock houseboats for rental. As I had previously stated on at least three occasions, we own only two and one-half acres at that location. No other land is available for sale, and we have no plans for further expansion in the forseeable future.
It should be readily apparent to anyone with any business experience that when a product is accepted by the public, the rules of supply and demand apply. We are available to supply the public with good food and good products, but the public does not have access to our location due to limited parking. If we have more business, we will employ more people. Even someone with no experience in hiring employees or conducting a business should be able to comprehend this.
It is apparent that you are making every conceivable effort to block this permit without properly researching your objections. If you can find property for sale at a reasonable price with the same access on a major roadway and waterway artery in Livingston Parish that requires no dredging and filling, please advise me within ten days of this letter of its location and details.
You have apparently picked out sites from a map without making any actual inspections of the properties you suggest as alternate sites for our project. You suggested a site on Natalbany River which I own. You then refer to an alleged application on Tickfaw River above the bridge, all of which indicates to me that your actions are not responsible. It is also apparent that you are not familiar with the area. I realize that your guidelines state that it is the responsibility of an applicant to show that other sites are not available. I further realize that it would probably be useless for me to personally point out to you each and every site you have picked from a map as an alternate site for this project.
As a lifelong resident of this area of Livingston Parish, I know the alternate sites you mention and know they are not for sale at any reasonable price at this time. I also know that they could not be used for our purposes without dredging and filling the wetlands to a greater degree than the project we have applied for, even if they could be purchased at a reasonable price.
On January 15, 1988, the surveyor for the Pardues prepared a map of the property proposed for use as mitigation. This survey shows elevations ranging from 6.6 feet to 1 foot. The map does not show *1156 which portion of the property will be used for mitigation.
On January 22, 1988, Timothy P. Killeen, an investigator for the DWF, inspected the site of the project and reported the following as a project alternative that could prevent or reduce the impact on fishing and wildlife resources:
From a habitat preservation standpoint, I see no reason why the barge should be moved from its present location. Mooring by cluster pilings or barge spudding should provide adequate stabilization. Any expansion to parking area should occur linearly along Hwy. 22. If his property does not extend parallel to the highway we can only suggest he acquire its ownership.
By letter dated January 28, 1988, DNR advised Hobart Pardue as follows:
In our last letter, the Coastal Management Division (CMD) requested additional information on the feasible alternatives to the proposed work, the public benefits of the project, and details of the houseboat rental proposal. As explained previously, the purpose of these questions was not to delay the permit process, but to allow CMD to proceed as expeditiously as possible to a permit decision. This additional information is necessary for our consideration of LCRP Guideline 1.8, a copy of which is attached. Consideration of Guideline 1.8 is triggered by the lack of compliance of the proposed work with Guidelines 6.1 and 6.4, the guidelines for surface alteration. This letter should clarify our informational needs.
Additional information has been requested on tax revenues and employment. The purpose of this request is to establish that benefits will be significant and clearly outweigh the adverse impacts associated with the project. Establishing these facts is crucial to the balancing process required in LCRP Guideline 1.8. We are required to apply Guideline 1.8 since your project appears not to comply with Guidelines 6.1 and 6.4. More specific information is needed to clarify this aspect of the project so that the CMD can proceed with processing of the permit application.
The response to our question on feasible alternatives was not specific enough to satisfy Guideline 1.8. LCRP Guideline 1.6 allows the CMD to request sufficient information to evaluate whether or not feasible alternatives exist. As you are aware, the guideline states that it is the responsibility of the applicant to discuss the feasibility and availability of alternatives. In earlier letters, several apparently feasible sites were pointed out by the CMD in an effort to assist you in your analysis of alternatives. Certainly you are more familiar with the area than we are; indeed greater familiarity is one basis for placing the responsibility for addressing alternatives on the applicant. In order to further assist you in addressing the issue of alternative locations, several examples of alternative location analysis are attached. These examples should give you an idea of the level of specificity we need to satisfy Guideline 1.6(e) and 1.8.
We also asked in our last letter that you provide more details on the proposed docking and rental of houseboats. This information is requested in accordance with Guideline 1.6(j), (o), (p) and (q), which deal with the necessary infrastructure, secondary and cumulative impacts, proximity to public works, and impacts to navigation. The existing docks are apparently used by visitors to the restaurant. Mooring of houseboats would displace these boats and it might be expected that additional dock space would be required. Rental of houseboats may require fairly long term parking for those customers. We are concerned not only about the land that you presently own, but the incentive for further development of adjacent land, whether by yourself or other landowners.
Another aspect of the houseboat rental proposal is that the Department of Health and Human Resources has indicated that additional services at the site would require enlargement of your sewerage treatment system. Please contact Mr. Louis Carpenter at 504/342-1616 to *1157 discuss this issue further. The CMD has a Memorandum of Understanding with DHHR, which requires that we notify them of proposed projects and incorporate their comments into our permit decision to the maximum extent practicable.
We have received the survey plat of the area proposed for mitigation. Generally mitigation is not considered at this stage of reviewing your permit application. As soon as we have received sufficient information to complete our review, we will contact you to discuss the mitigation proposal.
We will make every effort to process your application quickly once responses to these questions are received. Any additional information you may wish to supply to demonstrate that your application complies with the Coastal Use Guidelines would be helpful. This request is in accordance with the Rules and Procedures for Coastal Use Permits, Part III G. (1) which allows the CMD to stop processing of an application pending receipt of additional information. Please contact me if you have any questions.
Hobart Pardue responded to this letter by letter dated February 11, 1988, which stated the following:
This will acknowledge your letter of January 28, 1988. In reviewing that letter and your previous correspondence of December 9, 1987, and December 28, 1987, I find that you have picked out and added to the terms of the Guidelines and the statute creating the Coastal Management program. I suggest that you look at R.S. 49:213.8 C. (1), (2), (6) and (10), all of which apply to our project.
It appears that you have violated R.S. 49:213.8 C. (7) which states "reduce governmental redtape and costly delays and insure more predictable decisions on permit applications." On February 27, 1987, approximately one year ago, you advised that you could not process our application until the objection of DHHR was lifted. In March, 1987, you stated that our project was not in compliance with Guidelines 6.1 and 6.4. To the contrary, Guideline 6.1 is directly in point for our project under Section 6.1, b), 3). Guideline 6.4 should be ruled by R.S. 49:213.8, C. (6). Further, Guideline 6.5 affects our project since the barge and restaurant have docking facilities which make them water dependent. Also, in your letter of December 9, 1987, you stated "if it is claimed that if public benefits will result from the proposed use, then in accordance with Guideline 1.8, these benefits must be `substantial'." Nowhere in that Guideline is the word "substantial" used.
I responded to your request for information on additional alternative sites on December 10, 1987. That letter is comparable to the copies of the letters you forwarded me in your letter of January 28, 1988. It is clear to me that the purpose of your further requests for details clearly establishes your intent to delay this project as much as possible.
I point out to you that your "Coastal Use Permit" pamphlet states that after a public notice, the review process takes a minimum of forty seven days from the time of receipt of the application, and after receipt of the public notice comments, a five day review period is allowed. Since the last objection by the Louisiana Wildlife and Fisheries was withdrawn on November 9, 1987, you have taken more than sixty days to nitpick and violate R.S. 49:213.8 C. (7).
Please make your decision as to my permit immediately. If your decision is adverse to me, I will be more than happy to take this matter to court in Livingston Parish according to R.S. 49:213.16 D, E and F.
Because this letter did not give (1) details of the houseboat rental proposal, (2) details concerning tax revenues and employment, and (3) details concerning alternative sites, it was construed by DNR as evidencing an intent not to provide this requested information.
On March 2, 1988, Devan Pardue went to the DNR office in Baton Rouge and advised that he intended to completely answer the questions concerning taxes, employees and alternative sites. He further advised that he had no present intention to rent houseboats and the idea was just a *1158 possibility. On March 4, 1988, DNR received a six page letter (with three attached exhibits) from Devan Pardue. In this letter Devan Pardue contended his project was not in violation of Guidelines 6.1 and 6.4 and gave his reasons to support this statement. He advised that in 1987 his business had gross sales of approximately $170,500, paid sales taxes of approximately $12,000, and had 34 employees earning wages of $55,000. Fishermen sold $20,000 worth of harvest at the business. Eighty percent of the sales and seventy-five percent of the employment was generated by the floating restaurant. He gave detailed reasons why alternative sites were not available. Finally, he gave a detailed description of the activities to be conducted at the site.
By letter dated April 6, 1988, the Secretary of DNR advised Devan Pardue that a coastal use permit was denied for the project for the following reasons:
After a full and fair consideration of all information relative to the referenced permit application, and a balancing of social, environmental and economic factors, it has been determined that the proposed activity does not comply with Coastal Use Guidelines 1.7a, e, j, k, p, s, t & u, 3.2 and 6.4. The proposed use also does not comply with Guideline 1.8 which provides guidance in balancing social, economic and environmental factors relative to the proposed activity when it does not comply with a substantive standard set forth in those guidelines which contain the "maximum extent practicable" modifier. Since the proposed activity does not comply with the Coastal Use Guidelines, the requested Coastal Use Permit is denied in accordance with the Rules and Procedures for Coastal Use Permits Part III H(1).
As required in Subsection H(2) of the Rules and Procedures Part III, a copy of the statement of the basis for the decision and the recommendation for denial is attached.
The staff memorandum dated March 29, 1988, upon which this decision is based, is attached hereto as Appendix A.
This suit was filed on April 12, 1988.

RIGHT TO TRIAL DE NOVO AND ITS LEGAL EFFECT

(Assignment of error A)
The Secretary of DNR asserts the "lower court erred in not reviewing the administrative record of Mr. Devan Pardue's Coastal Use Permit application as required by the judicial review provisions of Louisiana Revised Statutes 49:213.16 F. and 49:964 G." He argues that (1) "allowance of trial de novo review of administrative permit decisions is a rare legal concept in Louisiana," (2) "[T]here is nothing in the legal literature that addresses it as a Louisiana concept," (3) "[S]ince there is no indication as to what `trial de novo' review means under Louisiana law, it is appropriate to review its meaning outside of Louisiana," (4) under the Federal Administrative Procedure Act, 5 U.S.C.A. 551, et seq., a trial de novo review of an agency decision is appropriate only when the agency's factfinding procedures are inadequate, (5) the trial court's reasons for judgment do not reflect that the administrative record was reviewed to determine if the factfinding procedures were inadequate, and (6) "the failure of the trial court to do so means that its `trial de novo' in this case was and is legally flawed."
La.R.S. 49:213.16(D), (E) and (F) provide for the judicial review of the actions of the Secretary of DNR on applications for coastal use permits, in pertinent part, as follows:
D. Any person authorized by this Part to appeal a coastal use permit decision or any local government aggrieved by a final decision on approval of a local program may seek judicial review of that decision whether or not a petition for reconsideration has been filed under this Section....
E. Proceedings for review may be instituted by filing a petition in the district court of the parish in which the proposed use is to be situated within thirty days after mailing of notice of the final decision by the secretary or, if a reconsideration is requested, within thirty days after the decision thereon.

*1159 F. Judicial review shall otherwise be pursuant to the Louisiana Administrative Procedure Act, provided that all such cases shall be tried with preference and priority. Trial de novo shall be held upon request of any party. (Emphasis added)
La.R.S. 49:964(A) of the Louisiana Administrative Procedure Act (LAPA) provides, in pertinent part, as follows:
A person who is aggrieved by a final decision or order in an adjudication proceeding is entitled to judicial review under this Chapter whether or not he has applied to the agency for rehearing, without limiting, however, utilization of or the scope of judicial review available under other means of review, redress, relief, or trial de novo provided by law.... (Emphasis added)
When construed in pari materia, these statutes are clear and unambiguous in providing that an applicant for a coastal use permit from the Secretary of DNR is entitled to a trial de novo in district court if the application is denied and the applicant requests such a trial. The remedy of a trial de novo is a separate (or additional) remedy from a review of the record under the LAPA. R. Force and L. Griffith, The Louisiana Administrative Procedure Act, 42 La.L.Rev. 1227, 1281 (1982). Devan Pardue requested a trial de novo in this case.
There are many statutes in Louisiana which provide for judicial review of an administrative decision by a trial de novo. La.R.S. 3:1212 (Board of Adjustment of a Soil and Water Conservation District); La. R.S. 4:158 (Louisiana State Racing Commission); La.R.S. 18:53 (removal of a Registrar of Voters by the State Board of Election Supervisors); La.R.S. 23:1378 (Louisiana Worker's Compensation Second Injury Board); La.R.S. 26:106 and 303 (Louisiana Commissioner of Alcoholic Beverage Control); La.R.S. 32:761 and 776 (Louisiana Used Motor Vehicle and Parts Commission); La.R.S. 32:1256 (Louisiana Motor Vehicle Commission); La.R.S. 33:4764 (Removal of Dangerous Buildings by the Governing Authority of a Municipality); La. R.S. 37:1378 (State Plumbing Board); La. R.S. 41:509, 549 and 550 (Register of the State Land Office). Trials de novo also are provided for in several judicial proceedings. La.R.S. 13:1137 (Appeals from New Orleans City Courts to the Civil District Court for the Parish of Orleans); La.R.S. 13:1452.1 (Appeal from Parish Court Traffic Hearing Officer to a Parish Court); La. R.S. 13:1896 (Appeals from criminal convictions in Mayor's Court and Justice of the Peace Courts to District Court); La.C.C.P. arts. 4924 and 4925 (Appeals in civil actions from Justice of the Peace Courts to the Parish Court, or if there is no Parish Court, to the District Court); La.R.S. 13:4209 (Cases where a trial is held and case taken under advisement, no transcript was taken or statement of facts submitted, and a district or city court judge dies, resigns or leaves office prior to deciding the case); La.R.S. 40:1299.35.5 (Appeals from courts having juvenile jurisdiction to courts of appeal where the issue is an abortion upon a pregnant woman who is under 18 years of age).[1] A trial de novo in a judicial proceeding means a trial anew or from the beginning. Scott v. Moore, 214 La. 1090, 39 So.2d 741 (1949). The appellate court tries the case as in a court of original jurisdiction. State v. Bickham, 208 La. 1026, 24 So.2d 65 (1945). At a trial de novo in the appellate court, the whole case is open for decision. Town of Sulphur v. Stanley, 207 La. 1075, 22 So.2d 655 (1945); City of Minden v. Harris, 196 La. 1021, 200 So. 449 (1941). At a trial de novo the whole case is retried as if there had been no prior trial whatever had been had. Black's Law Dictionary 1349 (5th ed. 1979).
We perceive of no reason to distinguish between a trial de novo in a judicial proceeding and a trial de novo in an administrative proceeding. In either case, the appellate court acts as the court or agency of original jurisdiction and the whole case is open for a decision. Judicial review under *1160 the LAPA involves only a review of the record of the administrative agency; it does not involve a trial de novo. La.R.S. 49:964. In the absence of a special statute, this is the type of judicial review that would take place. By specifically providing for a trial de novo upon request under La.R.S. 49:213.16(F), the legislature obviously intended that a different type of judicial review from the type of review provided for in the LAPA. The distinction between a LAPA judicial review and a trial de novo is discussed in Buras v. Board of Trustees of Police Pension Fund of City of New Orleans, 367 So.2d 849, 853 (La. 1979) as follows:
These provisions defining the nature and scope of judicial review under the Administrative Procedure Act do not authorize a trial de novo in the reviewing court. To the contrary, it is clear that the review "shall be confined to the record" as established before the agency. If the reviewing court were allowed to hear such matters de novo and substitute its judgment for that of the administrative agency, it would be usurping the power delegated by the legislature to the administrative agency. It should also be noted that the Administrative Procedure Act, properly complied with, operates to the advantage of both the parties and the courts. It enables the parties to resolve their disputes in a less cumbersome and expensive manner than normally encountered at a trial in court. At the same time, the courts are relieved of the time-consuming task of hearing the evidence. It further permits the administrative agency to weigh and evaluate the evidence with proper respect being given to its expertise in the matter. Additionally, it promotes the uniform application of the statute under which the agency operates. (Emphasis added)
Thus, in a trial de novo of an administrative proceeding, the appellate court can make its own factual determinations, exercise its own discretion and substitute its own judgment for that of the administrative agency.
A review of the record shows that the trial court properly conducted a trial de novo in this case.
This assignment of error is without merit.

FAILURE TO FOLLOW APPLICABLE COASTAL MANAGEMENT LAW, RULES AND GUIDELINES

(Assignment of error B)
The Secretary of DNR asserts the trial court "erred in not basing its decision on the provisions of the Louisiana State and Local Resources Management Act (La.R.S. 49:213.1, et seq.), the Legislatively-approved `Rules and Procedures for Coastal Use Permits', and the Legislatively-approved Coastal Use Guidelines."
At the trial de novo, Devan Pardue testified, and presented the testimony of Frank Crane, Dr. Gary Childers, Dr. Keith Bancroft, Deputy Wayne Sanders, Mindy Lemoine[2] (under cross-examination). The entire *1161 record of the administrative proceedings in DNR, and the final Environmental Impact Statement for the Louisiana Coastal Resources Program, which contains the Coastal Use Guidelines, were also filed in evidence.
Frank Crane was qualified as an expert in marine construction. He testified he did dredging, filling, bulkhead and pile driving work. He sold the restaurant barge to Devan Pardue and delivered it to the site. While at the site he inspected it and determined that construction of the proposed site improvements was feasible.
Dr. Gary Childers, the head of the Department of Biology at the Southeastern Louisiana University in Hammond, Louisiana (Southeastern), was qualified as an expert in environmental microbiology. He testified the project would have an insignificant environmental impact on the wildlife in the area. Although local water flow would be altered by the project, the water would still reach its intended destination.
Dr. Keith Bancroft, an assistant professor in the Department of Biology at Southeastern, was qualified as an expert in microbiology ecology. He testified that the Tickfaw River ecosystem had 14,000 acres in it, and the project only affected 1.5 acres, or 0.12% of the ecosystem. It was his opinion that the project would have a miniscule effect on the ecosystem.
Deputy Wayne Sanders, the chief of operations of the Livingston Parish Sheriff's Office, testified that lack of adequate parking at the restaurant site caused people to park on the access road to the restaurant, which in turn created a hazard to the flow of traffic. Additional parking would alleviate this problem.
The trial court gave the following pertinent reasons for judgment:
First, this Court notes that the general area in which petitioner proposes to establish his business already has a high intensity of development including, among others, Shelly O'Neal Estates (I and II), Warsaw Marina, Blood River Landing, Tickfaw Marina, and Tin Lizzy's Landing Restaurant, the latter two developments being located directly across the river from the site of plaintiff's projected development. Significant, too, is the fact that not only does Louisiana Highway 22 cut through the wetlands and cypress swamp adjacent to petitioner's property, but also a seafood processing market, restaurant, tavern, parking area, and dock presently adjoin the area designated for the planned parking lot and slip. Most convincing, however, of [sic] the fact that the development which plaintiff proposes would present no ecological problem for the area in question was the tesitmony [sic] of Dr. Gary Childers, who was qualified as an expert in marine biology. Dr. Childers asserted that the project around which the present litigation centers would have a zero impact on the ecology of the area relative to some of the other projects in the corridor of development along the river. In this regard he declared that not only would the project have an insignificant impact on the movement of water to the wetlands, but also that the food-chain of the area would not be significantly impacted.
Consequently, this Court holds that the defendant acted improperly in denying plaintiff's application for a permit. Clearly, as established by the records of defendant and testimony at trial, petitioner's proposal presents no threat of disrupting the ecological balance of the wetlands in question, particularly in view of the corridor of development already in place along the river.
As previously indicated, at a trial de novo in an administrative proceeding the reviewing court makes its own factual findings, exercises its own discretion and substitutes its judgment for that of the administrative agency. In essence, the reviewing court *1162 becomes the administrative agency for the administrative decision, which in this case is the granting or denying of a coastal use permit. When acting in this capacity, the reviewing court must follow all pertinent laws and administrative rules and regulations.
In The Work of the Louisiana Legislature for the 1978 Regular SessionEnvironmental Law, 39 La.L.Rev. 246 (1978) appears the following:

Coastal Zone Management
Congress' concept of the federal government's role in the area of environmental affairs is one of increasing federal determination of the substantive environmental quality standards, with the implementation of these standards left up to the states. The federal substantive standards designed to encourage the protection and preservation of coastal areas were enacted in 1973 in the Coastal Zone Management Act. The Act provides coastal zone states with funds to assist them in developing a coastal zone management program which will meet the requirements of the federal act. A state's development of a federally approved program is not mandatory, but it is a prerequisite to receiving federal funds for coastal zone management. If a state's program meets further enumerated requirements, the state can receive additional funds for the management of the program. (Footnotes omitted)
To comply with Coastal Zone Management Act, 16 U.S.C.A. §§ 1451-64, Louisiana passed the State and Local Coastal Resources Management Act, La.R.S. 49:213.1-49:213.22. Acts 1978, No. 361, effective January 1, 1979. La.R.S. 49:213.2 declared the following public policies:
The legislature declares that it is the public policy of the state:
(1) To protect, develop, and, where feasible, restore or enhance the resources of the state's coastal zone.
(2)(a) To assure that, to the maximum extent feasible, constitutional and statutory authorities affecting uses of the coastal zone should be included within the Louisiana Coastal Management Program and that guidelines and regulations adopted pursuant thereto shall not be interpreted to allow expansion of governmental authority beyond those laws.
(b) To express certain regulatory and non-regulatory policies for the coastal zone management program. Regulatory policies are to form a basis for administrative decisions to approve or disapprove activities only to the extent that such policies are contained in the statutes of this state or regulations duly adopted and promulgated pursuant thereto. They are to be applicable to each governmental body only to the extent each governmental body has jurisdiction and authority to enforce such policies. Other policies are nonregulatory. They are included in the Coastal Zone Management Plan to help set out priorities in administrative decisions and to inform the public and decision makers of a coherent state framework, but such policies are not binding on private parties.
(3) To support and encourage multiple use of coastal resources consistent with the maintenance and enhancement of renewable resource management and productivity, the need to provide for adequate economic growth and development and the minimization of adverse effects of one resource use upon another, and without imposing any undue restriction on any user.
(4) To employ procedures and practices that resolve conflicts among competing uses within the coastal zone in accordance with the purpose of this Part and simplify administrative procedures.
(5) To develop and implement a coastal resources management program which is based on consideration of our resources, the environment, the needs of the people of the state, the nation, and of state and local government.
(6) To enhance opportunities for the use and enjoyment of the recreational values of the coastal zone.
(7) To develop and implement a reasonable and equitable coastal resources management program with sufficient expertise, *1163 technical proficiency, and legal authority to enable Louisiana to determine the future course of development and conservation of the coastal zone and to ensure that state and local governments have the primary authority for managing coastal resources.
The Secretary of DNR was designated to administer the Louisiana Coastal Management Program. La.R.S. 49:213.6. In this capacity, the Secretary of DNR was directed, in conjunction with the Secretary of DWF, to develop guidelines for granting, conditioning, denying, revoking, or modifying coastal use permits. La.R.S. 49:213.8. Pursuant to La.R.S. 49:213.8(C) these guidelines shall have the following goals:
(1) To encourage full use of coastal resources while recognizing it is in the public interest of the people of Louisiana to establish a proper balance between development and conservation.
(2) Recognize that some areas of the coastal zone are more suited for development than other areas and hence use guidelines which may differ for the same uses in different areas.
(3) Require careful consideration of the impacts of uses on water flow, circulation, quantity, and quality and require that the discharge or release of any pollutant or toxic material into the water or air of the coastal zone be within all applicable limits established by law, or by federal, state, or local regulatory authority.
(4) Recognize the value of special features of the coastal zone such as barrier islands, fishery nursery grounds, recreation areas, ports and other areas where developments and facilities are dependent upon the utilization of or access to coastal waters, and areas particularly suited for industrial, commercial, or residential development and manage those areas so as to enhance their value to the people of Louisiana.
(5) Minimize, whenever feasible and practical, detrimental impacts on natural areas and wildlife habitat and fisheries by such means as encouraging minimum change of natural systems and by multiple use of existing canals, directional drilling, and other practical techniques.
(6) Provide for adequate corridors within the coastal zone for transportation, industrialization, or urbanization and encouraging the location of such corridors in already developed or disturbed areas when feasible or practicable.
(7) Reduce governmental red tape and costly delays and ensure more predictable decisions on permit applications.

(8) Encourage such multiple uses of the coastal zone as are consistent with the purposes of this Part.
(9) Minimize detrimental effects of foreseeable cumulative impacts on coastal resources from proposed or authorized uses.

(10) Provide ways to enhance opportunities for the use and enjoyment of the recreational values of the coastal zone.
(11) Require the consideration of available scientific understanding of natural systems, available engineering technology and economics in the development of management programs.
(12) Establish procedures and criteria to ensure that appropriate consideration is given to uses of regional, state, or national importance, energy facility siting and the national interests in coastal resources. (Emphasis added)
No person can commence a project which affects the Louisiana Coastal Zone without applying for and receiving a coastal use permit from the Secretary of DNR, except as provided for in La.R.S. 49:213.15. La. R.S. 49:213.11. Pursuant to La.R.S. 49:213.11(C)(3) "[T]he coastal use permit decision must be consistent with the state program ... and must represent an appropriate balancing of social, environmental and economic factors." (Emphasis added).
Guidelines have been provided by DNR for surface alterations in the Louisiana *1164 Coastal Zone.[3] The Guidelines define surface alterations as "those uses and activities which change the surface or usability of a land area or water bottom." Fill deposition and dredging are cited as examples of surface alterations. The project herein proposes to dredge a 210 by 40 foot slip for the restaurant barge and to fill an adjacent area with 5,710 cubic yards of fill to make a parking lot. These are surface modifications subject to the Guidelines.[4] Guideline 6.4 relied on by DNR provides as follows:
To the maximum extent practicable wetland areas shall not be drained or filled. Any approved drain or fill project shall be designed and constructed using best practical techniques to minimize present and future property damage and adverse environmental impacts. (Emphasis added)
This guideline directs that wetland areas (such as in the instant case) ordinarily shall not be filled, but if they are, the filling must be done in such a way that it minimizes (to the maximum extent possible) the present and future (1) property (wetland) damage and (2) adverse environmental impacts.
Guideline 6.4 must be construed in pari materia with Guideline 1.8 which provides as follows:
In those guidelines in which the modifier "maximum extent practicable" is used, the proposed use is in compliance with the guideline if the standard modified by the term is complied with. If the modified standard is not complied with, the use will be in compliance with the guideline if the permitting authority finds, after a systematic consideration of all pertinent information regarding the use, the site and the impacts of the use as set forth in guideline 1.6, and a balancing of their relative significance, that the benefits resulting from the proposed use would clearly outweigh the adverse impacts resulting from non-compliance with the modified standard and there are no feasible and practical alternative locations, methods and practices for the use that are in compliance with the modified standard and:
a) significant public benefits will result from the use, or;
b) the use would serve important regional, state or national interests, including the national interest in resources and the siting of facilities in the coastal zone identified in the coastal resources program, or;
c) the use is coastal water dependent.
The systematic consideration process shall also result in a determination of those conditions necessary for the use to be in compliance with the guideline. Those conditions shall assure that the use is carried out utilizing those locations, methods and practices which maximize conformance to the modified standard; are technically, economically, environmentally, socially and legally feasible and practical; and minimize or offset those adverse impacts listed in guideline 1.7 and in the guideline at issue. (Emphasis added)
Since Guideline 6.4 contains the modifier "maximum extent practicable," the filling of wetlands is prohibited unless the project meets the three tests provided for in Guideline 1.8. To grant a coastal use permit for filling wetlands, DNR is required to follow the analytical process provided in Guideline 1.8. In a trial de novo, the reviewing court must do the same thing that DNR was required to do. In the final Environmental Impact Statement for the Louisiana Coastal Resources Program, which was filed in evidence as Joint Exhibit 2, the proper methodology for applying Guideline 1.8 is set forth as follows:

*1165 The three tests provided for in guideline 1.8 are to be carried out as follows:
The first test, which requires that the benefits resulting from the use must clearly outweigh the adverse impacts that would result from non-compliance with the triggering guideline, resembles a cost/benefit analysis. The test requires that the resulting benefits, whether public or private, are of sufficient magnitude to make the loss of coastal resources acceptable. However, this is not a straight cost/benefit ratio with monetary allocations to benefits and damages. As environmental harm frequently is not capable of being measured in monetary values and research to provide proper allocation is, at best, tenuous, monetary allocations are unacceptable. The process is more in the nature of a subjective test which places heavy emphasis on the value of the natural resources and the value to the public from the proposed use.
The second test assures that if another location or design for a use is available which would allow the use to be successfully carried out in compliance with the triggering guideline it must be utilized. In carrying out this test, full consideration must be given to all feasible and practical alternatives including alternative locations for the use and alternative methodologies and practices for the use at the best location. This consideration of alternatives should be similar to the process provided for under Section 102 of the National Environmental Policy Act. In considering what alternatives are feasible and practical, the decision maker must consider the alternatives legally and economically available to the particular person applying for the permit. However, the decision maker is not held to the options economically available to the applicant. This test is what alternatives would be available to a reasonable person in a normal situation. An undercapitalized applicant should not be permitted to damage or destroy important public resources when a well financed one is prevented from doing so.
The third test is made up of three criteria, one of which must be met. The first one of the criteria which can be met is whether significant public benefits will accrue from the proposed use. These public benefits must go to the public as a whole, not just to a few individuals in the locality, and must be measurably substantial.
The second criterion is whether the use will serve important interests of greater than local concern. Such uses are those which would serve the national interest in the siting of facilities and resources which have been specifically identified in Tables 7 and 8 in Chapter VI of this document. This assures that those projects which are important to the region, to the state or to the nation, are assured full consideration.
The third criterion available is whether the use is coastal water dependent. Coastal water dependent uses are defined on page 65 as "those which must be carried out on, in or adjacent to the water body or wetland or requires the consumption, harvesting or other direct use of coastal resources, or requires the use of coastal water in the manufacturing or transportation of goods. Examples of uses meeting the terms of this definition include surface and subsurface mineral extration [sic], fishing, ports and necessary supporting commercial and industrial facilities, facilities for the construction, repair and maintenance of vessels, navigation projects, and fishery processing plants". This provides the special status appropriate for coastal water dependent uses for which there are sometimes only a limited range of locational alternatives.
If the three tests are met, permit conditions are developed to assure that the use results in minimal adverse impacts. The language of the guideline, while not requiring mitigation, clearly permits it and, when read in conjunction with certain other guidelines, as for example guideline 4.2, makes it clear that any activity reasonably available to the permittee to reduce or offset adverse impacts should be utilized if it is practical *1166 to do so the conditions placed on permits must, however, be feasible and practical in that they must be limited to these locations, methods and/or practices which are of established usefulness and efficiency which allow the use to be carried out successfully. The decision maker must give full consideration to technical, economic, environmental, social, and legal limitations, in determining the feasibility and practicality of permit conditions which must be applied. Such consideration ensures that conditions are arrived at in a balanced fashion, consistent with both the CZMA and Act 361. (Emphasis added)
A review of the trial court's reasons for judgment shows that it failed to follow the analytical process required by Guideline 1.8. The trial court merely found as fact that the general area around the project was one with a high intensity of development and that the project would not have a significant impact on the ecology of the area and concluded from this that DNR acted improperly in denying the permit. The trial court's reasons for judgment do not show how it complied with the analytical process required by Guideline 1.8. In this posture we are unable to give the trial court findings the usual deference attributed to them. Cf. Bloxom v. Bloxom, 512 So.2d 839 (La.1987); Clement v. State, Department of Transportation and Development, 528 So.2d 176 (La.App. 1st Cir.), writ denied, 532 So.2d 157 (La.1988). Further, Appendix cl of the Guidelines sets forth the rules and procedures for the issuance, suspension, and revocation of coastal use permits. Part III(H)(1) of Appendix cl provides as follows:
The permitting body will determine whether or not the permit should be issued. Permits shall be issued only for those uses which are consistent with the guidelines, the state program and affected approved local programs. Permit decisions will be made only after a full and fair consideration of all information before the permitting body, and shall represent an appropriate balancing of social, environmental and economic factors. The permitting body shall prepare a short and plain statement explaining the basis for its decision on all applications. This statement shall include the permitting body's conclusions on the conformity of the proposed use with the guidelines, the state program and approved local programs. The statement shall be dated, signed, and included in the record prior to final action on the application. (Emphasis added)
The trial court (which was acting de novo) fell into legal error by failing to show in its reasons for judgment how the project met the requirements of Guideline 1.8. La.R.S. 49:964(G)(1) and (4). This legal error has further interdicted the trial court's judgment. This assignment of error has merit. However, because the record before us is complete, we will proceed to make an independent review of the record and adjudicate the case. McLean v. Hunter, 495 So.2d 1298 (La.1986).
The proposed project is composed of two parts: (1) dredging a 210 by 40 foot slip and installing bulkheads on the north and east sides of the slip, and (2) depositing 5,710 cubic yards of fill in 1.4 acres of wetland area to expand a parking lot.
The principal benefit of the parking lot portion of the project will be the alleviation of traffic congestion on the access road to the restaurant site. The testimony of Devan Pardue, Deputy Wayne Sanders and the letter from Sheriff Odom Graves attached to Devan Pardue's March 4, 1988 letter show that the present parking area at the site is inadequate, patrons of the restaurant park along the access road if they cannot get into the parking lot, and a traffic hazard is created on the access road. Of lesser and more contingent benefit would be increased business at the restaurant due to more convenient parking for the public which would generate more taxes for public bodies and more employment. Devan Pardue testified at the trial that if he could expand his parking and restaurant seating he could increase his work force to 50 or 60 people.
The principal adverse impact of the parking lot expansion would be the physical removal of 1.4 acres from the wetlands. *1167 However, in the general area of this project, there is already significant development in place and a business has been operated at the project site since approximately 1934. Further, as indicated by the testimony of Drs. Gary Childers and Keith Bancroft, the Tickfaw River ecosystem contains 14,000 acres, the project area of 1.5 acres is only 0.12% of that of the ecosystem, and the project would have little or no impact on the wildlife and ecology of the ecosystem. Although the water flow in the area of the project would be altered, the water will still reach its intended destination. After reviewing the various pertinent factors set forth in Guidelines 1.6 and 1.7,[5] *1168 and after balancing the benefits of the parking lot expansion with the pertinent adverse impacts, we conclude that the benefit to the public of alleviating the traffic hazard on the restaurant's access road clearly outweighs the adverse impacts. This benefit is enhanced by the fact that the applicant proposes to replace the acreage to be used for the parking lot with a significantly greater amount of acreage which will be converted into wetlands.
The evidence shows there are no feasible and practical alternative locations or methods for expanding the parking at the restaurant site. The testimony of Devan Pardue at the trial and his letter of March 4, 1988, demonstrate this. Finally, for the reasons previously set forth, we conclude that the alleviation of the traffic hazard on the access road to the restaurant will result in a significant public benefit and justifies the issuance of the permit for the parking lot expansion.
Accordingly, that portion of the trial court judgment which orders the Secretary of DNR to issue a coastal use permit to Devan Pardue for the parking lot expansion is affirmed.
The second test of Guideline 1.8 is that the proposed project has no feasible and practical alternative locations, methods and practices. The portion of the project for dredging and bulkheading a slip to permanently moor the restaurant barge cannot pass this test. The fact that the restaurant on the barge is in operation, and has been in operation for some time, demonstrates that there is a practical and feasible alternative to dredging a slip. The evidence of record fails to demonstrate the necessity for this portion of the project. In particular, the January 22, 1988 report of Timothy P. Killeen, an investigator for DWF, observes that "I see no reason why the barge should be moved from its present location. Mooring by cluster pilings or barge spudding should provide adequate stabilization." The trial court erred in ordering the Secretary of DNR to grant this portion of the permit.
The trial court did not consider or discuss the mitigation in its reasons for judgment or in its judgment. The trial court erred by failing to do so. The mitigation offered is substantial, significant to the permitting procedure and in the public interest to receive.

EXPENSES OF ADMINISTRATIVE PROCEEDING

(Assignment of error B)
The trial court judgment provided that "plaintiff be awarded the sum of $3,500.00 attorney's fees plus reimbursement for all expenses incurred as a result of this litigation according to LSA-R.S. 49:9651.1 [sic] to be paid by defendant." The trial court gave the following reasons for this ruling:
Moreover, this Court further holds that plaintiff is entitled to an award of $3,500.00 for attorney's fees and reimbursement for all the expenses incurred as the result of the present litigation, this award being justified under the precepts delineated in LSA-R.S. 49:9651.1 [sic] due to the dilatory tactics employment by the Department of Natural Resources in delaying ruling an [sic] petitioner's application and the Department's Subsequent denial fo [sic] the permit without substantial justification therefor.
The Secretary of DNR asserts that "it was error to order the State to pay Mr. Pardue's attorney's fees and expert witness fees, which decision should also be reversed by this Court." Pardue responds that "the attorney's fees awarded have now become inadequate and appellee respectfully suggests that this Court has authority to raise the award."
La.R.S. 49:965.1 provides, as follows:
§ 965.1. Expenses of administrative proceedings; right to recover
*1169 A. When a small business files a petition seeking: (1) relief from the application or enforcement of an agency rule or regulation, (2) judicial review of the validity or applicability of an agency rule, (3) judicial review of an adverse declaratory order or ruling, or (4) judicial review of a final decision or order in an adjudication proceeding, the petition may include a claim against the agency for the recovery of reasonable litigation expenses. If the small business prevails and the court determines that the agency acted without substantial justification, the court may award such expenses, in addition to granting any other appropriate relief.
B. A small business shall be deemed to have prevailed in an action when, in the final disposition, its position with respect to the agency rule or declaratory order or ruling is maintained, or when there is no adjudication, stipulation, or acceptance of liability on its part. However, a small business shall not be deemed to have prevailed, if the action was commenced at the instance of, or on the basis of a complaint by, anyone other than an officer, agent, or employee of the agency and was dismissed by the agency on a finding of no cause for the action or settled without a finding of fault on the part of the small business.
C. An agency shall pay any award made against it pursuant to this Section from funds in its regular operating budget and shall, at the time of its submission of its proposed annual budget, submit to the division of administration and to the presiding officer of each house of the legislature a report of all such awards paid during the previous fiscal year.
D. As used in this Section:
(1) "Reasonable litigation expenses" means any expenses, not exceeding seven thousand five hundred dollars in connection with any one claim, reasonably incurred in opposing or contesting the agency action, including costs and expenses incurred in both the administrative proceeding and the judicial proceeding, fees and expenses of expert or other witnesses, and attorney fees.
(2) "Small business" means a small business as defined by the Small Business Administration, which for purposes of size eligibility or other factors, meets the applicable criteria set forth in 13 Code of Federal Regulations, Part 121, as amended. (Emphasis added)
For a court to have the authority to award the expenses of an administrative proceeding, it must be shown that the "small business" (1) prevailed in court and (2) "the agency acted without substantial justification". The trial court awarded the expenses because it found (1) DNR employed dilatory tactics in ruling on the application and (2) DNR denied the permit without substantial justification. La.R.S. 49:965.1 does not provide for awarding expenses where there are excessive delays by the agency. By so holding, the trial court committed legal error. The trial court committed factual manifest error by holding DNR acted without substantial justification. The permit decision in this case is a "close call". DNR received letters of objection to the project from the Habitat Conservation Division of the National Marine Fisheries Service of the United States Department of Commerce, the Fish and Wildlife Service of the United States Department of the Interior and the United States Environmental Protection Agency. Further, DWF initially objected to the project and only withdrew its objection when the applicant offered substantial mitigation. Finally, a review of the DNR staff memorandum (upon which its denial is based) reveals substantial reasons to support its decision.
This assignment of error has merit.

DECREE
For the foregoing reasons, (1) the judgment of the trial court ordering the Secretary of DNR to grant the permit for expanding the parking lot at the restaurant site is affirmed; (2) the judgments of the trial court ordering the Secretary of DNR (a) to grant the permit for dredging and bulkheading the slip for mooring the restaurant barge and (b) to pay the expenses *1170 of the administrative proceeding pursuant to La.R.S. 49:965.1 are reversed and these claims are dismissed; and (3) this case is remanded to the Secretary of DNR for appropriate action on the applicant's mitigation offer. The court costs in this case total $1,229.70, and they shall be divided equally between the parties.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REMANDED IN PART.

APPENDIX A

State of Louisiana

Department of Natural Resources

March 29, 1988
MEMORANDUM
To: C.G. Groat
From: Mindy Lemoine
Re: Statement and Recommendation on CUP P870030, DeVan Pardue Application to Dredge a Slip for a Restaurant on a Barge & Place Fill for a Parking Lot; on the Tickfaw River Livingston Parish, Louisiana
The referenced application requests a permit to dredge a 40' × 210' slip to permanently moor a barge upon which a restaurant has been built, and to place fill in a swamp to construct a parking lot. The total project will impact 1.5 acres of swamp. The application has been thoroughly reviewed for compliance with the Coastal Use Guidelines, which were legislatively enacted by Act 361, the La. State and Local Coastal Resources Management Act of 1978. Act 361 requires that the Coastal Management Division consider economic, social and environmental factors in order to balance conservation and development. This balancing process is applied by use of the Coastal Use Guidelines. The proposed use has been found inconsistent with the Coastal Use Guidelines and denial of the permit application is recommended. A discussion of the history of the site, the proposed use and the application of the guidelines to the proposed use follows.
History of Site and Proposed Use
On March 10, 1986, the Coastal Management Division (CMD) received Coastal Use Permit (CUP) application P860220 from Mr. Hobart Pardue, requesting a permit to construct docks, dredge to deepen 2 boat basins and fill approximately 0.15 acres of swamp to enlarge a parking lot at an existing small restaurant and bait shop. During the permit review process, it was discovered that work had commenced at the site. Processing of the permit application was suspended while the violation was reviewed. The applicant had deposited fill in a swamp area approximately 15' × 150', and was constructing new buildings on the site of the existing small restaurant. Since the new buildings were being built in a previously impacted area, they were not considered to have a direct and significant impact on coastal waters and therefore did not require a coastal use permit as stated in Part II A(1)(f) of the Rules and Procedures for Coastal Use Permits in the La. Coastal Resources Program (LCRP). Mr. Pardue was directed to remove the fill from the swamp area, which he did. Processing of the application was resumed and a permit was issued on September 17, 1986. The recommendation to issue the permit stated that the use did not comply with LCRP Guidelines 3.2, 6.4 or 1.8 but that it did comply with Guideline 6.1(b)(3) since it was continuing the traditional and existing use of the area and also that it was impacting only 0.15 acres of swamp. The traditional and existing use of the area was essentially continued since the previous use has been two residences and a small restaurant, bait shop and boat rental facility, while the new facility was a small restaurant, of approximately the same size as the earlier facility.
Within 2½ months after this permit was issued, another possible violation was reported. A large barge had been moored at the previously permitted dock and a restaurant was being constructed upon it. Mr. Hobart Pardue had stated during the permit review for P860220 that no long-term docking was proposed at the site. After the barge was in place, Mr. Hobart Pardue, the landowner and permittee for P860220, *1171 was informed that a permit should be obtained if he planned a commercial facility at the site. He was also informed that a permit or lease from the Division of State Lands (DSL) was required for the barge at its present site. The application for a DSL lease was submitted but all requirements were not satisfied, so the permit was never issued. On March 18, 1988, Mr. Karl Morgan of the Division of State Lands stated that the barge was illegally moored and that the applicant was liable for the cost of a lease from the time the barge was placed.
The application under consideration here was submitted by DeVan Pardue, Hobart Pardue's son, who operates the described facility. Mr. Tom Plauche of C.L. Jack Stelly and Associates was the designated agent for the permit application. During the course of processing the permit, some misunderstandings apparently occurred between the agent and the applicant, which led to Mr. Hobart Pardue taking over as the agent. Mr. DeVan Pardue has become involved in the processing again since the last week of February, 1988.
The permit file contains an extensive correspondence record. The Louisiana Department of Health and Human Resources (LDHHR) and the Louisiana Department of Wildlife and Fisheries (LDWF) both objected to the project. The LDWF requested denial because significant adverse impacts would occur as a result of the proposed construction. They chose to withdraw their request for denial based on the applicant's offer of mitigation. The CMD does not review mitigation proposals until the review and balancing process is complete and adverse impacts are unavoidable. The LDHHR objected to the permit until additional information was provided to them on treatment of sanitary waste at the site, which now has been done to their satisfaction. The U.S. Fish and Wildlife Services (USFWS) has requested denial based on the non-water-dependent nature of the activity and the anticipated loss of fish and wildlife habitat resource values. The National Marine Fisheries Services (NMFS) recommends that the project be revised to eliminate dredging and filling since the project purpose is not water dependent and non-wetland alternatives must be assumed to be available. The Environmental Protection Agency (EPA) has recommended denial since the activity proposed does not require access or proximity to a special aquatic site to fulfill its basic purpose, and alternative sites are presumed to be available unless clearly demonstrated otherwise.
In accordance with the Rules and Procedures for CUP's Part III G(1), processing of this application was suspended on February 27, 1987 due to the DHHR request for more information. The applicant was asked on March 6, 1987 to respond to the DWF denial request and to provide more information on how the project complies with Guideline 1.8. Due to an apparent lack of communication between the applicant and his agent, the applicant was not made aware of these letters. The CMD transmitted copies of these letters to Mr. Hobart Pardue on October 1, 1987. Since that time, the CMD has been corresponding with Mr. Pardue in an effort to obtain complete information upon which to base a decision.
It is important to distinguish the activity presently under review and its purpose from the activity permitted under P860220. The earlier activity was a minimal enlargement of an existing parking lot which accompanied the upgrading and renovation of an existing small bait shop and restaurant. Almost immediately after the earlier work was approved and constructed, the barge was moored at the site and construction commenced upon it. At some point the use of the existing building was changed from a restaurant to a small scale seafood processing facility and seafood, grocery and gas sales. The work proposed now is construction of a slip to moor a separate restaurant and bar and a parking lot to serve the facility. The existing building does provide some service to the restaurant in that fresh seafood is prepared for use in the restaurant. Mr. DeVan Pardue asserted in a conversation on March 2, 1988 that the restaurant is an independent commercial seafood processing facility, but did not *1172 make that statement in his letter delivered March 4, 1988.
The existing facility permitted under CUP P860220 and the restaurant are certainly related, however they are not dependent on each other. The existing facility has an adequate parking area for its current use. The restaurant could receive fresh seafood at any alternative non-wetland location by truck. It is not necessary for a restaurant to receive seafood directly from a dock.
It is important to recognize that the barge-supported restaurant is operating without a CUP; the CMD has not approved the permanent mooring of the barge. The barge, as it exists, is also in apparent violation of state laws regulating the use of state owned water bottoms.
Guidelines With Which The Proposed Activity Conflicts
1.7(a) The proposed project would cause an alteration in water flow by blocking flow into the river along a 210' frontage. Runoff of the entire 1.5 acre site would be accelerated. The destruction of the highly productive natural wetland forest will reduce the supply of sediment and nutrients to the Louisiana coastal system.
1.7(e) Approx. 1.5 acres of highly productive wetland forest will be altered by the dredging and deposition of fill. This area is particularly valuable because it is an "edge" habitat where stream and swamp meet, allowing a high level of nutrient exchange and providing high quality nursery habitat.
1.7(j) Significant adverse cumulative impacts may result if this use is permitted. In a conversation on March 2, 1988, Mr. DeVan Pardue stated that the adjacent landowner had refused to sell his property, but had inquired about the process for applying for a permit to develop his property. Issuing a permit for a large commercial development at this site would establish a new scale and type of use at a site where only a very small scale activity had been present.
1.7(k) This activity will discharge suspended solids and create high turbidity in the Tickfaw River during the dredging operation. The extent of the turbidity will depend on the river flow and tide conditions at the time. The unvegetated parking lot will allow accelerated runoff and continue to increase turbidity during heavy rainfalls for an indefinite period.
1.7(l) This project will reduce water circulation into an area of wetland forest north of the proposed parking lot.
1.7(p) The proposed work will cause permanent adverse alteration of 1.5 acres of valuable wetland forest. The site is an interface between swamp and river which is a particularly valuable habitat.
1.7(s) The proposed slip will permanently alter 0.2 acres of wetland forest to open water, contributing to the severe land loss problem in the La. Coastal Zone.
1.7(t) Construction of a permanent structure such as the proposed restaurant in a floodplain will increase the likelihood that hurricanes or floods will damage the structure. Elimination of 1.5 acres of flood plain also reduces flood storage for the river basin. Placement of the restaurant and parking lot on higher ground above the 5' contour would eliminate both of these problems.
1.7(u) This project will permanently alter 1.5 acres of highly productive coastal wetlands, eliminating habitat available for wetland-dependent wildlife, reducing the nutrient supply to coastal waters, and altering the hydrologic regime of the surrounding swamp. Further development of the area might be expected, resulting in adverse cumulative impacts of reduced habitat, decreasing productivity and increased likelihood of flood damage.
3.2 The proposed slip is a linear use alignment taking place in wetlands and permanently altering 0.2 acres of valuable wetland forest habitat.
6.1 This guideline provides guidance on areas suitable for development within the coastal zone. The guideline states specifically that the uses "shall be consistent with the other guidelines". Only after compliance *1173 with the other LCRP guidelines has been determined for the site in question should the review proceed to the specific recommendations for site choice contained in 6.1. In this case, the proposed use does not comply with Guidelines 1.7: a, c, j, k, l, p, s, t, u, 3.2 and 6.4. Since the use is not consistent with other guidelines, it is not necessary to address parts a and b of Guideline 6.1. Although it is not necessary to address these parts of the guideline, it can be shown, for the sake of argument, that the proposed use does not meet the required standards of parts a and b. The proposed use is not on lands five feet or more above sea level or in fastlands, as required in Guideline 6.1(a). The first part of 6.1(b) relates to land stability and flood hazard. Since the project requires fill to construct the proposed parking lot, the existing foundation conditions are not apparently suitable to support the use. One of these first two criteria must be satisfied to meet the standard of Guideline 6.1. In addition, one of three criteria related to site development must be met such that (1) the land is already in high intensity of development use, or (2) there is adequate supporting infrastructure, or (3) the vicinity has a tradition of use for similar habitation or development. The site cannot be considered to be in a high intensity of development use as required in the first of these criterion. The existing facility is of a rather small scale, and it is the only commercial facility on the north side of the Tickfaw River in the vicinity. The second criterion is not satisfied because the proposed project includes a parking lot, which is essentially supporting infrastructure for the restaurant installation. Sewerage facilities can also be considered infrastructure. In this case, the larger sewerage facilities needed for the proposed restaurant have already been installed in the parking lot of the existing facility, displacing some of the existing parking space. Finally, the proposed activity is very different from the traditional use of the site. The original small restaurant, baitshop and boat rental facility was run by people who resided on the property. The earlier work represented an expansion of the traditional use, but remained similar in scale. This proposed restaurant and parking lot are a much more intensive use of the site.
6.4. The proposed use does not comply with this guideline because it involves the filling of 1.3 acres of wetlands. The impact will be a permanent alteration of the habitat involving clear-cutting of trees and filling to an elevation of + 5' MSL.
Consideration of 1.8 "Maximum Extent Practicable" Standard
All of the guidelines with which the proposed project conflicts contain the phrase "to the maximum extent practicable" (MEP). The meaning and application of this standard is explained in Guideline 1.8 and is further explained in Chapter 2 of the LCRP Final Environmental Impact Statement (FEIS). Its purpose is "to delineate the manner in which the benefits and impacts of a proposed use, as well as available alternatives, are systematically reviewed and balanced." The application of MEP is appropriate only when the project under review conflicts with a guideline which contains the MEP standard. The MEP process "establishes the basis upon which discretion can be exercised to resolve apparent conflicts or inconsistencies among the other guidelines". This guideline includes three tests, all of which must be satisfied if the proposed use is to be considered to be in compliance with the guideline modified by the MEP clause.
The first finding of fact that must be made under 1.8 is that: "The benefits resulting from the use would clearly outweigh the adverse impacts that would result from noncompliance with the modified standard". The instructions on how to use the Coastal Use Guidelines describe this test as "a subjective test which places heavy emphasis on the natural resource and the value to the public from the proposed use".
The benefits described by the applicant include generation of tax revenues, employment and tourism. The applicant's letter of December 19, 1987 stated that current employment was 9 people and that employment was expected to increase to 30 people *1174 with the increased parking and docking. Construction jobs would also be provided over the short term, however, the majority of construction work on the barge-supported restaurant has been completed. The volume of business was expected to increase by 200% when the construction was completed, with tax revenues increasing proportionately. Our letter of December 28, 1987 asked how additional jobs other than construction jobs would be generated, since the restaurant is already operating. No answer has been provided to this question. One factor to consider is that the restaurant business in the area is highly seasonal, with summer being the peak of business. The number of employees can be expected to fluctuate widely depending on the time of year. A letter hand delivered by DeVan Pardue on March 4, 1988 provided additional information on employment and revenues. He stated that the total facility has 34 direct employees, with a total payroll for 1987 of $55,000. The facility had sales of $170,500, which generated approximately $12,000 in sales tax, in 1987. Approximately 80% of the sales and 75% of the employment is generated by the restaurant. Income to the fishermen selling their catch to the shop exceeded $20,000.
The applicant has stated that the facility would result in increased tourism but has not provided any data to support this claim. Since there are several similar restaurants in the vicinity, there is no reason to believe that the proposed facility would attract additional tourists to the area.
The first test of Guideline 1.8 requires that adverse impacts be balanced against these benefits. Guideline 1.7 provides a list of adverse impacts to be avoided. These impacts were discussed in the section of this memo which listed the guidelines violated by the proposed work and will be summarized here. The direct adverse impact includes dredging of 0.2 acres of wetland forest and clearing and deposition of fill upon 1.3 acres of wetland forest. This activity will result in the direct loss of habitat for birds and mammals and nursery and feeding areas for freshwater fish. The loss of habitat will result in a reduced supply of nutrients to coastal waters. The alteration and reduction in water flow will affect the surrounding wetland forest area. Since the proposed construction has a fairly long frontage along the river, circulation in and out of the river will be reduced. The long frontage on the river means that a relatively large area of valuable "edge" habitat is impacted. Suspended solids will be discharged during the dredging activity, possibly causing short-term fish kills.
One of the most important impacts to be avoided is listed in 1.7(j): adverse effects of cumulative impacts. The cumulative adverse impact of issuing a permit for the proposed project could be very significant. Permitting one activity such as a restaurant in a particular wetland area means that similar proposals will probably occur. While the applicant is not responsible for the activities of adjacent landowners, it is the responsibility of the CMD to anticipate the direction of development in an area and to consider the cumulative impacts of each project during the review process. In this case, the precedent set by allowing construction of a parking lot and slip in wetlands to serve a non-coastal-water-dependent activity which happens to be located on a barge would be damaging to the LCRP. The door would be open for anyone to establish a non-coastal-water-dependent activity on a barge, then, once some benefits are demonstrated, demand a permit for permanent installation and support facilities.
Based on all of this, it does not appear that the benefits clearly outweigh the adverse impacts of this project. The applicant has not made it clear that the restaurant will be shut down if this permit is not issued. If the restaurant continues to operate on the barge in the river, or if the equipment and operation is moved to a non-wetland site, which in this area is generally at or above the +5' MSL contour, the described benefits will continue to accrue. The direct adverse impacts on natural resources described in Sec. 1.7 and resulting from the proposed project are significant as described above. The potential cumulative impacts are very significant in that permitting this use would establish a new scale *1175 and type of development at the location. This could be expected to result in future development upon which it would be very difficult to place a limit. Since the instructions on how to use the CUG require that heavy emphasis be placed upon "the value of the natural resources and the value to the public from the proposed use", it must be concluded that the benefits do not clearly outweigh the adverse impacts of the activity, after performing this benefit/adverse impact analysis. The first 1.8 test is not met.
The second MEP test that must be met is that "there are no feasible and practical alternative locations, methods, or practices for the use that are in compliance with the modified standard." The March 6, 1987 letter from CMD to Mr. Pardue's agent, C.L. Jack Stelly & Associates, stated that alternative sites for the proposed use which do not require filling or dredging of wetland should be feasible since the proposed use is not coastal wetland dependent and asked for information to support any contrary point of view. In a response dated October 19, 1987, Mr. H. Pardue stated that no alternate site is feasible. In a phone conversation of this period, Mr. Pardue indicated that he considered the CMD suggestion that he investigate alternative upland sites for his restaurant to be ridiculous. The CMD then attempted to assist Mr. Hobart Pardue by suggesting several suitable water oriented sites which were found to be infeasible by the applicant for reasons of access and availability. Since the use is not coastal water dependent, as discussed below, alternative sites are not limited to water oriented sites. Extensive upland areas exist along the same highway as the site in question. The +5' MSL contour line is located only about two miles north of the proposed location. Sites with an elevation of greater than +5' MSL would usually not require a coastal use permit. The applicant has apparently not investigated any of these sites and has indicated that he is not willing to consider them.
An alternate method of providing parking space has been implemented at busy times in the past when parking space has been provided at an upland site. Customers were either shuttled back and forth to the restaurant, or valet service was provided. This alternative method may be especially suitable for this type of restaurant, which supports a very seasonal trade. Thus, the second MEP is not satisfied because there is a feasible alternative method of performing the use as well as alternative upland sites that would comply with the modified guidelines.
The third test in the MEP is that the use meets one of the following criteria: "(a) significant public benefits will result from the use, or (b) the use would serve important regional, state or national interests, including the national interest in resources and the siting of facilities in the coastal zone identified in the coastal resources program, or (c) the use is coastal water dependent."
The proposed use does not satisfy the first of these criterion. The benefits must be substantial and accrue to the public as a whole as stated in the instructions on how to use the Coastal Use Guidelines in Chapter II of the FEIS. In this case, the benefits accrue mainly to the restaurant owners, to the employees in the form of wages and indirectly to the public in the form of taxes. Examples of public benefits that have been found sufficient to satisfy this criteria are shoreline access points, flood protection or energy production. This facility does not provide any of these public benefits. Public benefits which may be provided by this restaurant are the possible economic benefits to local and state governments and the possible increase in employment opportunities. These same possible benefits would accrue to any commercial activity in the region, and cannot be considered significant enough to distinguish this project as providing significant benefits to the public at large.
The proposed use also does not satisfy the second criterion of the third test, which requires that the use serve important interests of greater than local concern. These *1176 concerns, which are listed in Tables 7 and 8 in Chapter VI of the FEIS for the LCRP are national defense and aerospace, energy production and transmission, recreation, transportation, air and water quality, wetlands and endangered species, historic and cultural resources, fisheries and other living marine resources. This restaurant does not serve any of the listed interests except recreation. While the facility does provide entertainment, it serves a limited area and is not a unique facility, therefore it cannot be considered a recreational facility that serves a regional state or national concern.
The third criterion is also not satisfied by the proposed use, which is a restaurant and a parking lot. The applicant has confused the issue somewhat by constructing a restaurant upon a barge and installing it without a permit adjacent to an existing small restaurant and shop. The essential use remains that of a restaurant, which in this case is not dependent upon water any more than an office complex or a condominium development. This point is clarified by the definition of coastal-water-dependent on Page 65 of the LCRP which states that control water dependent uses are "... those which must be carried out on, in or adjacent to coastal water areas or wetlands because the use requires (emphasis added) access to the water body or wetland or requires (emphasis added) the consumption, harvesting or other direct use of coastal resources, or requires (emphasis added) the use of coastal water in the manufacturing or transportation of goods. Examples include surface and subsurface mineral extraction, fishing, ports and necessary supporting commercial and industrial facilities, facilities for the construction, repair and maintenance of vessels, navigation projects, and fishery processing plants." This definition is quoted in the instructions on how to use the Coastal Use Guidelines which apply this definition to the 1.8 test. The instructions state that this coastal water dependent test "provides the special status appropriate for coastal water dependent uses for which there are sometimes only a limited range of locational alternatives". This discussion is very similar to Guideline 6.5, which states "Coastal water dependent uses shall be given special consideration in permitting because of their reduced choice of alternatives". It does not appear that Guideline 6.5 should be applied in any broader fashion than the third criterion of the third test of Guideline 1.8. Guideline 6.5 is being applied by using the coastal water dependency test in Guideline 1.8.
The letter from the applicant which was delivered on March 4, 1988 made several claims as to how the proposed use is coastal water dependent. These claims do not appear to be valid. In the letter, the applicant describes the facility as a port and supporting commercial and industrial facility. While boats do tie up at the existing small seafood processing facility, store and restaurant for short periods, the activity does not meet the definition of a port, which is, even in its most general definition, "A place of anchorage or shelter; a haven", (American Heritage Dictionary). The applicant has attempted to show that the existing permitted facility (the seafood shop, gas station and grocery market) is dependent upon the restaurant as a "supporting commercial and industrial facility" which is included as a coastal water dependent use in the guideline definitions of the LCRP. In fact, it is not dependent on coastal waters. Any seafood processed at the existing permitted facility could easily be transported to a restaurant at a non-wetland site via the adjacent highway. While the applicant at one point claimed that seafood processing for resale occurred in the restaurant, he provided no evidence that seafood processing was any more extensive than that which ordinarily takes place in any restaurant that serves fresh seafood. According to the applicant, the facility does not have a seafood processing permit from the LDWF and he apparently does not feel that one is necessary, although he is aware of the criteria for that permit. The proposed facility does not appear to be a fishery processing plant as meant in the guideline definitions. The proposed use does not satisfy the third criterion of the third part of the MEP test.
*1177 Recommendation:
In summary, the proposed use violates Coastal Use Guidelines 1.7a, e, j, k, e, p, s, t and u, 3.2 and 6.4. All of the violated guidelines contain the MEP test, which triggers consideration of Guideline 1.8. After systematically reviewing and balancing all pertinent information, it has been determined that no part of Guideline 1.8 is satisfied by the proposed use. Therefore, the proposed use is not in compliance with any of the guidelines listed as being violated and is not in compliance with Guideline 1.8. Consequently, the CMD recommends that no permit should be issued for the use. Permitting the use would allow a loophole to develop in the LCRP, by which a non-coastal water dependent use could be established on a water-borne facility and coastal water dependency claimed, leading to the unnecessary destruction of valuable coastal resources in contradiction to the Coastal Use Guidelines and the La. Coastal Resources Program.
NOTES
[1] Trials de novo were provided for in La. Const. of 1921, art. 7, §§ 36 and 91 and La. Const. of 1913, art. 111.
[2] Apparently a permit from the United States Corps of Engineers is required for the project, in addition to the DNR coastal use permit. Lemoine gave the following testimony at the trial:

Q. Was the Corp of Engineers' approach consistent with the approach of your agency?
A. Yes. They had serious concerns with this application. It has now been withdrawn by the Corp of Engineers for lack of progress in the application. They feel there is notThe issues have not been adequately addressed by the applicant.
Q. So, what has been withdrawn?
A. The Corp of Engineers' application for this project has been withdrawn by the Corp of Engineers. They have returned the application to the applicant.
Q. And that is the Pardue's?
A. Right.
Q. So, in other words they have nothing pending they could approve at the present?
A. No. It would have to be resubmitted or reinstated.
Q. Is it for [sic] possible for an applicant to pursue a project without a Corp of Engineers' approval?
A. No, it is not.
Q. In a case such as this if the applicant gets a coastal use permit from your department, could they pursue the project without Corp of Engineers approval?
A. No, they would have to have that Corp permit before [sic] could do any work.
Q. If an applicant got a Corp of Engineers' permit, could they pursue the project without a coastal use permit?
A. No. While we have many joint procedures and a lot of coordination between us, we operate under two separate legislative acts and two separate permits are required. There are some significant differences in the legislative act. However, the basis of both of them is protection of wetland areas.
[3] It is not contested that the project herein is located in the Louisiana Coastal Zone and is a project for which a permit is required.
[4] Guidelines have been provided for shoreline modifications. Shoreline modifications are defined as "those uses and activities planned or constructed with the intention of directly or indirectly changing or preventing change of a shoreline." Bulkheads and slips are cited as examples of shoreline modifications. Guideline 5.1 provides that "[N]on-structural methods of shoreline protection shall be utilized to the maximum extent practicable."
[5] Guidelines 1.6 and 1.7 provide as follows:

Guideline 1.6 Information regarding the following general factors shall be utilized by the permitting authority in evaluating whether the proposed use is in compliance with the guidelines.
a) type, nature and location of use.
b) elevation, soil and water conditions and flood and storm hazard characteristics of site.
c) techniques and materials used in construction, operation and maintenance of use.
d) existing drainage patterns and water regimes of surrounding area including flow, circulation, quality, quantity and salinity; and impacts on them.
e) availability of feasible alternative sites or methods for implementing the use.
f) designation of the area for certain uses as part of a local program.
g) economic need for use and extent of impacts of use on economy of locality.
h) extent of resulting public and private benefits.
i) extent of coastal water dependency of the use.
j) existence of necessary infrastructure to support the use and public costs resulting from use.
k) extent of impacts on existing and traditional uses of the area and on future uses for which the area is suited.
l) proximity to and extent of impacts on important natural features such as beaches, barrier islands, tidal passes, wildlife and aquatic habitats, and forest lands.
m) the extent to which regional, state and national interests are served including the national interest in resources and the siting of facilities in the coastal zones as identified in the coastal resources program.
n) proximity to, and extent of impacts on, special areas, particular areas, or other areas of particular concern of the state program or local program.
o) likelihood of, and extent of impacts of, resulting secondary impacts and cumulative impacts.
p) proximity to and extent of impacts on public lands or works, or historic, recreational or cultural resources.
q) extent of impacts on navigation, fishing, public access, and recreational opportunities.
r) extent of compatibility with natural and cultural setting.
s) extent of long term benefits or adverse impacts.
Guideline 1.7 It is the policy of the coastal resources program to avoid the following adverse impacts. To this end, all uses and activities shall be planned, sited, designed, constructed, operated and maintained to avoid to the maximum extent practicable significant:
a) reductions in the natural supply of sediment and nutrients to the coastal system by alterations of freshwater flow.
b) adverse economic impacts on the locality of the use and affected governmental bodies.
c) detrimental discharges of inorganic nutrient compounds into coastal waters.
d) alterations in the natural concentration of oxygen in coastal waters.
e) destruction or adverse alterations of streams, wetland, tidal passes, inshore waters and waterbottoms, beaches, dunes, barrier islands, and other natural biologically valuable areas or protective coastal features.
f) adverse disruption of existing social patterns.
g) alterations of the natural temperature regime of coastal waters.
h) detrimental changes in existing salinity regimes.
i) detrimental changes in littoral and sediment transport processes.
j) adverse effects of cumulative impacts.
k) detrimental discharges of suspended solids into coastal waters, including turbidity resulting from dredging.
l) reductions or blockage of water flow or natural circulation patterns within or into an estuarine system or a wetland forest.
m) discharges of pathogens or toxic substances into coastal waters.
n) adverse alteration or destruction of archaeological, historical or other cultural resources.
o) fostering of detrimental secondary impacts in undisturbed or biologically highly productive wetland area.
p) adverse alteration or destruction of unique or valuable habitats, critical habitat for endangered species, important wildlife or fishery breeding or nursery areas, designated wildlife management or sanctuary areas, or forestlands.
q) adverse alteration or destruction of public parks, shoreline access points, public works, designated recreation areas, scenic rivers, or other areas of public use and concern.
r) adverse disruptions of coastal wildlife and fishery migratory patterns.
s) land loss, erosion and subsidence.
t) increases in the potential for flood, hurricane or other storm damage, or increases in the likelihood that damage will occur from such hazards.
u) reduction in the long term biological productivity of the coastal ecosystem.